NATIONAL SURETY CORPORATION, PLAINTIFF-RESPOND-
ENT, v. ARTHUR F. BARTH, INDIVIDUALLY, AND
TRADING AS BARTH CONTRACTING COMPANY, ET
ALS., DEFENDANTS-RESPONDENTS; J. LINDSAY DE
VALLIERE, DIRECTOR, ETC., CHARLES R. ERDMAN,
JR., ADMINISTRATOR, ETC., DIVISION OF EMPLOY-
MENT SECURITY, ETC., DEFENDANTS-APPELLANTS,
AND CHARLES MARTINI AND FRANK MARTINI, PLAIN-
TIFFS-RESPONDENTS, v. ARTHUR F. BARTH, DEFEND-
ANT.

Argued January 26, 1953—Decided March 2, 1953.

*Mr. Herman D. Ringle* argued the cause for the appellants, Charles R. Erdman, Jr., Administrator of Public Housing and Development Authority, Department of Economic Development of the State of New Jersey, J. Lindsay De Valliere, State Commissioner of Taxation and Finance, and Division of Employment Security, Department of Labor and Industry. (*Mr. Theodore D. Parsons,* Attorney-General, by *Mr. Chester K. Ligham,* Deputy Attorney-General, attorney for and of counsel with appellants J. Lindsay DeValliere, Director, etc. and Charles R. Erdman, Jr., Administrator, etc. *Mr. Charles A. Malloy,* attorney for Division of Employment Security of the Department of Labor and Industry).

*Mr. Charles A. Rooney* argued the cause for the respondent, National Surety Corporation.

*Mr. Edward V. Ryan* argued the cause for the respondent, United States of America.

The opinion of the court was delivered by

VANDERBILT, C. J. This appeal, certified on our own motion, presents the question whether the State of New Jersey can set off its claim for unemployment and disability tax obligations in an action against it for moneys owing upon contracts for public housing work.

On October 31, 1947 and March 12, 1948, respectively, Arthur F. Barth, a contractor, entered into contracts with the Administrator of Public Housing and Development Authority in the Department of Economic Development of the State of New Jersey (hereinafter called Administrator) for the alteration, repair, and rehabilitation of two public housing projects located on Lake Street and Laidlaw Avenue in Jersey City. Plaintiff National Surety Corporation, as surety, and Barth, as principal, executed a performance bond to the Administrator for each contract as required by law. One of the purposes of the bond requirement is to assure "payment by the contractor, and by all subcontractors, for all labor performed or materials, provisions, provender or other supplies, teams, fuels, oils, implements or machinery used or consumed in, upon, for or about the construction, erection, alteration or repair of such buildings, works or improvements." (R. S. 2:60–207). The Lake Street project was completed and accepted by the Administrator on October 19, 1948, and the Laidlaw Avenue job was finished and received the approval of the Administrator on March 28, 1949. The Administrator still retains some $10,592.63 due to Barth under the two contracts, which sum, however, is insufficient to pay all claims for materials furnished and labor performed on the two projects. Barth defaulted in some of his payments for labor and materials on both jobs, with the result that National Surety Corporation in accordance with the terms of the bonds paid many of these claims.

Meanwhile on February 7, 1949 the United States filed with the Administrator a notice of levy in the amount of $3,118.79 plus interest for withholding taxes due from Barth, only a part of which arose out of these two contracts. On

January 10, 1950 Charles Martini and Frand Martini recovered judgments in the Hudson County Court against Barth for $883.83 and $1,980, respectively, on claims unrelated to the two state contracts. These judgments were docketed in the Superior Court on January 19, 1950, and on January 31, 1950 levy was made upon the funds held by the Administrator. The State's claim arises out of Barth's indebtedness for taxes under the Unemployment Compensation Law and the Temporary Disability Benefits Law in the total amount of $9,083.76, as evidenced by three certificates of debt filed with the Clerk of the Superior Court. The State waives any preferential claim it may have for that amount of these taxes which arose out of the performance of the contracts in question. On May 4, 1950 National Surety Corporation instituted this action in the Chancery Division of the Superior Court, naming as defendants Barth, the Director of the Division of Budget and Accounting, the Administrator, the Martinis, some unpaid suppliers of labor and materials, and the United States of America. The purpose of the suit was to obtain exoneration to the extent that the funds held by the Administrator might be applied to the demands of the defendant suppliers, and subrogation to the extent that plaintiff had paid certain of the defendants on account of their claims against Barth. Meanwhile, Charles Martini and Frank Martini obtained in the Law Division of the Superior Court an order directed to Barth and to the Administrator to show cause why the court should not order the Administrator as garnishee to pay the Martini judgments under their levy. The State (Division of Employment Security of the Department of Labor and Industry) intervened to assert its setoff against Barth. On December 28, 1950 the two actions were consolidated in the Chancery Division. In *National Surety Corporation v. Barth*, 8 *N. J.* 121 (1951), we determined that the State had given its consent to be sued.

The Chancery Division, 20 *N. J. Super.* 100, held that the $10,592.63 in the hands of the Administrator was a trust fund for the benefit of those who had furnished labor, mate-

rial and equipment on the two projects and therefore the State could not set off its claims against this fund. The claim of the United States was held to be no greater than that of the contractor and was subordinate to the claims of the materialmen and laborers, except that the United States was allowed to share in the fund to the extent of $604.04 representing workmen's wages withheld by Barth on these two jobs but not paid to the United States Government. The Martini judgments, which arose out of claims totally unrelated to the two jobs, were also held to be subordinate to the rights of laborers and materialmen.

The only appeal before this court is that of the State, which contends that *N. J. S. A.* 2:60–212 (now *N. J. S.* 2A:44–148) does not impress a trust upon the moneys due from the State to Barth, and also that no such trust exists under general principles of equity, and therefore, it argues, its setoff of Barth's obligations under the Unemployment Compensation Law and Temporary Disability Benefits Law is proper.

*N. J. S. A.* 2:60–212 provides:

"All money paid by the State of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the State, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid."

The purpose of this statute was construed in *Stulz-Sickles Company v. Fredburn Construction Corp.,* 114 *N. J. Eq.* 475 (*Ch.* 1933), where Vice Chancellor Berry in his opinion for the court at *page* 478 said:

"I think it is obvious that the purpose of that act (and other co-related statutes enacted the same year) was to avoid, so far as surety companies were concerned, the effect of the decision of this court in *Grover v. Board of Education of the Township of Franklin,* 102 *N. J.*

*Eq.* 415; affirmed, 104 *N. J. Eq.* 197. It was there held that where a contractor paid a materialman moneys out of a payment by the board of education on account of the general contract, without any designation, express or implied, as to the application of such moneys, the materialman was at liberty to apply it to an antecedent debt due from the contractor, and that a lien subsequently filed by the materialman against the balance of the contract price in the hands of the board of education was good even as against the surety. And further, that the surety company had no right to require the primary application, by either the contractor or his creditors, of the contract moneys to the payment of debts arising out of the contract. * * * The obvious remedy to insure a proper application of the contract moneys was to impress them with a trust in favor of the contract creditors. The legislation referred to followed."

The legislative intent was to give laborers and materialmen protection in the form of a trust impressed on their behalf upon moneys paid by the State pursuant to the provisions of any public improvement contract. The statute applies only to those moneys "paid" by the State. Clearly the statute does not impress a trust upon the funds still in the posession of the State and not yet paid to the contractor. It is obvious that the statute has no relevance when we seek to discover whether the moneys held by the Administrator are a trust fund for materialmen and laborers. Neither expressly nor by implication does *N. J. S. A.* 2:60–212 either create such a trust or rule out the possibility of a trust fund in the hands of the Administrator.

We then face the question whether on equitable principles the moneys held by the Administrator prior to payment to the contractor constituted a trust fund for materialmen and laborers against which no setoff can be made. This requires a study of the source and purpose of the funds now held by the Administrator. The Legislature provided for public improvement work in *chapter* 323 of the *Laws of* 1946 (*N. J. S. A.* 55:14(*G*)–1, *et seq.*) in an act entitled "An Act providing for housing for veterans of World War II and other people of the State and declaring an emergency in respect thereto." In its declaration of policy (*N. J. S. A.* 55:14(*G*)–1) the statute sets forth:

"It is hereby declared that an acute public emergency exists in the serious shortage of dwelling accommodations for veterans of World War II, their families, and other people of this State; that adequate, safe, and sanitary dwelling accommodations are unavailable for veterans of World War II and their families; that the resulting conditions of insecurity, overcrowding, use of unsound and unsanitary buildings, and dislocation of family life are disruptive of morale, injurious to health and safety, and detrimental to morals, and constitute a dangerous threat to the well-being of the entire State; * * * that the acquisition, construction, management, operation, and disposition of such emergency housing and the real and personal property and other facilities necessary, incidental, or appurtenant thereto is a public use for which public money may be spent, and property acquired; and that the necessity in the public interest for the provisions hereinafter enacted is a matter of legislative determination."

Sections 22 and 23 of the act reveal the sources of funds to be used in furtherance of the purposes of the act:

"22. The State Treasurer is hereby authorized to receive from the Federal Government amounts of money if, as and when appropriated, allocated, granted, turned over or in anywise provided by the Federal Government to the State for use and expenditure by the State for the purpose of providing emergency housing, and said money may be used by the Administrator for the purposes of this act in the same manner as moneys hereinafter appropriated.

23. The sum of six million dollars ($6,000,000.00) is hereby appropriated out of the Post-War Reserve Account in the General State Fund established by 'An act to create a post-war reserve account in the General State Fund' (P. L. 1944, c. 218), together with moneys derived from the sale of bonds pursuant to a bill now pending in the Legislature creating a debt of the State in the sum of thirty-five million dollars ($35,000,000.00) to provide housing for veterans of World War II and other people of the State, if the same becomes a law by sanction of the people, to establish and provide an emergency housing fund. The moneys in such fund shall be available for the payment of the cost of acquisition of real and personal property; any rents under lease; construction, reconstruction, alteration, repair or improvement, razing, salvage or transportation; maintenance, operations and management; equipment, furniture and furnishings, vehicles; services and expenses; all costs in connection with and for work appurtenant thereto, including incidental expenses in accomplishing the purposes of this act, and to defray the administrative expenses of the Authority required by the provisions of this act. No money shall be paid out of such fund except on warrant of the State Commissioner of Taxation and Finance on vouchers certified or approved by the administrator."

Thus there are three sources from which these funds for public housing improvements arise—namely federal government appropriations, state appropriations out of the general state fund, and moneys to be raised from a bond issue. On public referendum a bond issue was approved. *Chapter* 324 of the *Laws of* 1946, *pages* 1363–1372, *N. J. S. A.* 55:14G—23 note, adopted at the general election provided in part:

"11. The proceeds from the sale of the bonds, exclusive of accrued interest and premiums, and all interest on deposits received from depositories, shall be paid to the State Treasurer and be held by him in a *separate fund*, and be deposited in such depositories as may be selected by him to the credit of the fund, which fund shall be known as the '*State Housing Fund*.' All accrued interest and premiums from the sale of bonds except as provided in section fourteen hereof, together with interest received from depositories of such funds, shall be held by the State Treasurer to the credit of the said State Housing Fund.

12. The moneys in the said State Housing Fund are hereby specifically *dedicated* to providing housing for veterans of World War II and other people of the State and shall be disposed of in accordance with this act through such agencies or by such means as the Legislature may by act provide for such purpose. Such fund shall be held for the demand of the Commissioner of Economic Development, or his successor, and shall be drawn upon and disbursed on his order, as other funds are now disbursed from the State Treasury. At any time prior to the issuance and sale of bonds under this act the State Treasurer is hereby authorized to transfer from any available money in the treasury of the State to the credit of the State Housing Fund such sum as may be deemed necessary for the purposes of this act by the Commissioner of Economic Development, which said sum so transferred shall be returned to the treasury of this State by the treasurer thereof from the proceeds of the sale of the first issue of bonds." (Emphasis added.)

The Legislature clearly intended to set aside all moneys received from these three sources and to earmark them for the purposes of public housing. The money was not available for any use except in furtherance of the policies of the act.

In *Goodwillie v. City of Bayonne* (an unreported case) the Chancery Court held that the City of Bayonne in a suit against it for balances due under a contract could not offset against the plaintiff's demands certain of its claims against

the plaintiff. We affirmed, 2 *N. J.* 88 (1949), basing our reasoning primarily on the equitable principle that once moneys have been received or allocated for a certain purpose such moneys become impressed with a definite trust to be disbursed for that purpose only. At *page* 92 of the opinion we said:

"The contract under which the federal funds became available provided that the grant, as well as the proceeds of the city's own bond issue, was required to be placed in a special 'Construction Account' to be used solely for the construction of the terminal. These funds were received and set aside by the city for specific purposes. When accepted by the city, they became earmarked and impressed with a trust obligating the city to expend them for the designated uses. *Mayor and Council of Hoboken v. Ivison*, 29 *N. J. L.* 65 (*Sup. Ct.* 1860) ; *Maurello v. Broadway Bank & Trust Co.*, 114 *N. J. L.* 167 (*E. & A.* 1935) ; *Borough of Deal v. Asbury Park and Ocean Grove Bank*, 118 *N. J. Eq.* 297 (*E. & A.* 1935) ; *Hopper v. New Jersey Title Guarantee & Trust Co.*, 127 *N. J. Eq.* 1 (*E. & A.* 1940)."

In *Mayor and Council of Hoboken v. Ivison*, 29 *N. J. L.* 65 (*Sup. Ct.* 1860), the Supreme Court stated at *page* 67 :

"Upon general principles of law, a fund raised for a specific purpose, and placed in the hands of an officer for such specific purpose, cannot lawfully be applied to any other. Any such other appropriation would be a violation of the trust, and so contrary to law."

*Fidelity and Deposit Company of Maryland v. McClintic-Marshall Corporation*, 115 *N. J. Eq.* 470 (*Ch.* 1934), affirmed in a *per curiam* opinion, 117 *N. J. Eq.* 440 (*E. & A.* 1935), is distinguishable; in that case no fund was set aside, such as we have here.

Although these cases did not involve funds held by the State the principle is still the same. Clearly funds have been appropriated and dedicated for a specific purpose by the United States Congress, the New Jersey Legislature, and the voters of the State of New Jersey. A special fund labelled "State Housing Fund" has been established and all moneys deposited therein are earmarked for the purposes of emergency housing. Withdrawals can be made only upon

the signature of the State Commissioner of Taxation and Finance on vouchers certified or approved by the Administrator. The materialmen and laborers, and therefore National Surety Corporation in view of its subrogation rights, have an equitable interest in these funds. Such an interest cannot be defeated by the State by the exercise of a setoff based upon the personal debt of the contractor totally unrelated to the work performed in furtherance of the purposes for which the fund was created.

The State claims that the respondent did not assert the theory of a trust based on general trust principles in the trial court but rather limited itself to a contention that a trust was created under *N. J. S. A.* 2:60–212, and therefore, it argues, the respondent should not be permitted to present this contention for the first time here. It is not altogether clear which theory was adopted by the Chancery Division, but obviously the respondent contended before that court that a trust fund existed.

The judgment of the Chancery Division is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.