60 N.J. Super. 251 (1960)
158 A.2d 692
MORRIS PICKER, PLAINTIFF-APPELLANT,
v.
THE CITY OF BAYONNE, A MUNICIPAL CORPORATION, ET AL., DEFENDANTS-RESPONDENTS, AND WILLIAM BRANCATELLA, ET AL., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 1959.
Decided March 11, 1960.
*252 Before Judges CONFORD, FREUND and HANEMAN.
Mr. David L. Maltz argued the cause for plaintiff-appellant.
Mr. William Rubin argued the cause for defendant-respondent, City of Bayonne (Mr. Edward Brigadier, attorney).
Mr. Bart R. Boyle argued the cause for defendant-respondent, Frank Carpenter Co.
The opinion of the court was delivered by CONFORD, J.A.D.
This is an appeal from a judgment of the Chancery Division adjudicating the priority of the claim of Frank Carpenter Co. ("Carpenter," hereinafter) as against plaintiff, Morris Picker, in and to certain moneys in the possession of the defendants City of Bayonne and Jacob Drogin which are being held by them in connection with the performance of a contract between defendant William Brancatella and the city for the construction of a municipal swimming pool by the former.
The controlling facts are found not only in the appendices of the briefs but also in certain supplemental affidavits which the court requested from the parties at and after oral argument *253 so that such original jurisdiction might be exercised by the court as was necessary to achieve a final determination of the controversy on its merits. R.R. 1:5-4. Supplemental briefs have been submitted by all the parties relating to the record as thus supplemented.
On May 19, 1953 the City of Bayonne adopted an ordinance to provide for the construction of a swimming pool and to authorize the issuance of bonds to finance the major portion of the cost thereof. In 1954 and 1956 amendatory ordinances were passed to increase the sums authorized to be raised for this purpose. The pool was eventually completed. A total of $191,000 was appropriated for the project from the following sources: $144,250 by sale of bond anticipation notes issued pursuant to the Local Bond Law, R.S. 40:1-1 et seq., as amended; R.S. 40:1-8; $15,000 by a "temporary internal loan from the city's capital cash account," authorized by the 1956 ordinance mentioned above; $20,824.58 by private contributions; and $10,925.42 appropriated from the city's capital account for the pool project as a "down payment," pursuant to N.J.S.A. 40:1-12. Of the above moneys all has been expended on the construction of the pool except for some $3,200 which was retained by the city under the terms of the general contract and is due Brancatella, and the sum of $270.93, which is being held by Drogin under circumstances to be related.
The present appeal reduces itself to a contest between Picker and Carpenter for priority in the distribution of these remaining funds. Picker is the holder of a judgment against Brancatella on a claim having no relation to the execution of the pool project, in the amount of $1,592.75, together with interest and costs. An execution levy to satisfy the judgment was effected April 19, 1956 against moneys due or to become due from the city to Brancatella. Carpenter supplied miscellaneous pool equipment to Brancatella on or about June 15, 1956 in the amount of $4,977.14, for which he has not been paid. Various other claimants against Brancatella appearing in the trial court have, in *254 effect, abandoned their claims insofar as these funds are concerned.
In January 1956 the city rescinded its contract with Brancatella because of the latter's default. By resolution passed April 3, 1956 the city renewed the contract and, in order to assure payment for labor and materials thereunder, appointed Drogin, a city legal assistant, as trustee, to receive the amounts due Brancatella and to disburse them to "persons entitled thereof." Although the trusteeship took no particular form, the individual resolutions authorizing warrants to be drawn to Brancatella, the first of which was issued in May 1956, indicated that Drogin was to be made joint-payee with Brancatella as trustee for that purpose. Drogin did, in fact, use the funds thus made available by the city to make payments to the various subcontractors and suppliers, whether or not they had first filed lien claims under the Municipal Mechanics Lien Act, N.J.S. 2A:44-125 et seq. He testified, further, that all payments made directly to Brancatella were for the purpose of meeting his payroll obligations. According to the findings of the trial judge, amply supported by the proofs, Brancatella retained none of the moneys paid him by Drogin, having applied all of them to pay laborers and materialmen on the job.
The swimming pool was opened to the public on or about June 15, 1956. On June 16, 1956 the city engineer certified to the governing body of the city that Brancatella had "satisfactorily completed 100% of his contract" and was entitled to the payment of $12,155.31, being the balance due therefor. On February 11, 1957 Carpenter filed a notice of municipal mechanics lien for the money due him. The city did not adopt a formal resolution of acceptance of the work from the contractor until July 2, 1958.
The city supports Carpenter's claim to priority against Picker in these remaining funds. They base their position on several alternative theories: (a) the Municipal Mechanics Lien Act, N.J.S. 2A:44-125 et seq.; (b) the Public Trust Fund Act, N.J.S. 2A:44-148 (erroneously designated as *255 2A:44-147 as adopted in the revision of Title 2); (c) the Local Bond Law, N.J.S.A. 40:1-85; and (d) a general equitable trust fund. We have concluded, as did Judge Kilkenny in the trial court, that Carpenter is entitled to priority on the last stated basis and will therefore not discuss the applicability of the others except to the extent that the Local Bond Law will be seen to support the trust fund rationale. Cf. Key Agency v. Continental Cas. Co., 31 N.J. 98 (1959).
The case at hand is controlled by the holding and reasoning by the Supreme Court in National Surety Corp. v. Barth, 11 N.J. 506 (1953). It would appear that there is no direct statutory authority for the impressment of a trust upon funds due to a general contractor in connection with a public improvement but still in the possession of a government agency. The Public Trust Fund Act, cited above, has particular reference to funds already paid to the contractor, and the Supreme Court, in the Barth case, supra, specifically ruled that the act does not operate to create a trust of funds not yet paid the contractor. The case holds, however, that while the act does not create a trust of funds still held by the public agency, it does not preclude a trust if one is properly impressed under ordinary equitable principles. Barth involved a fund in the hands of the Administrator of Public Housing which consisted of unpaid balances due to the general contractor on two public housing projects. The funds were received by the Administrator from the State Treasurer out of a specially-created State Housing Fund. Claimants to the unpaid balance were two judgment creditors, the surety company (representing, in effect, the claims of unpaid materialmen), the United States Government to satisfy a tax lien against the general contractor and the State to satisfy the general contractor's indebtedness for unemployment compensation taxes. The dates of the claims of the unpaid materialmen in relation to those of the other claimants are not noted. The trial court, consolidating all the other claims, held them inferior to those of the materialmen. *256 On the appeal taken by the State, the other adverse claimants not appealing, the court, in denying the State's claim, stated:
"A special fund labelled `State Housing Fund' has been established and all moneys deposited therein are earmarked for the purposes of emergency housing. Withdrawals can be made only upon the signature of the State Commissioner of Taxation and Finance on vouchers certified or approved by the Administrator. The materialmen and laborers, and therefore National Surety Corporation in view of its subrogation rights, have an equitable interest in these funds. Such an interest cannot be defeated by the State by the exercise of a setoff based upon the personal debt of the contractor totally unrelated to the work performed in furtherance of the purposes for which the fund was created." (11 N.J., at pages 514-515)
See also Goodwillie v. City of Bayonne, 2 N.J. 88 (1949), in which a trust was applied to money in the hands of the city, those funds also constituting part of a specially-created account including federal PWA funds. In the Barth case the court cited Goodwillie as resting on the "equitable principle that once moneys have been received or allocated for a certain purpose such moneys become impressed with a definite trust to be disbursed for that purpose only" (11 N.J., at page 514).
We regard the general philosophy of these holdings as applicable here. Insofar as the funds yet held by Drogin are concerned, these were explicitly made a trust fund for laborers and materialmen on this project. The situation as to the moneys still being held by the city itself may less clearly reflect a trust than the Drogin escrow arrangement does, but a trusteeship nevertheless inheres therein on the facts before us.
As to that portion of the fund consisting of the money raised by the municipal bond anticipation notes, dominant effect must be accorded the statutory directive that: "The proceeds of the sale of any obligations issued under this article shall be applied only to the purposes for which such obligations are authorized * * *." N.J.S.A. 40:1-85. The "down payment" is required to be appropriated for the *257 same purpose, N.J.S.A. 40:1-12. Moreover, it was unquestionably allocated by the city thereto. It has been suggested that the proceeds of the sale of securities are in fact being applied to the purposes for which the obligations were authorized when made available to a judgment creditor of the contractor, since the latter's efforts contributed to the construction of the pool. But the whole meaning of the Barth case, in view of the respective relationships of the contending parties to the general contractor in that case, is necessarily antagonistic to such a proposition. Within the holding and reasoning of the decision, moneys held by a public agency for the specific purpose of defraying the cost of a public improvement, under circumstances warranting the conclusion they are held in trust for that purpose, may not be disbursed to a creditor of the contractor to whom they are payable, ahead of those who provided labor and materials for the improvement.
The affidavit of the city comptroller states that the private contribution fund and the internal loan by the city formed, together with the bond anticipation notes and down payment, a "separate appropriation account" in the financial records of the city, and this is not controverted. In any case, all of these moneys clearly were at one time or another "received or allocated for a certain purpose [the pool project]," within the fair application and spirit of the Barth opinion, and, therefore, constituted a trust fund precluded from disbursement to any extraneous creditor of the contractor so long as materialmen or suppliers of labor on the public improvement remained unpaid. The amount of money in the funds in controversy being less than Carpenter's claim, they must be paid to him in entirety.
Judgment affirmed.
HANEMAN, J.A.D. (dissenting).
I do not agree with my colleagues' conclusion.
Plaintiff appeals from a judgment of the Chancery Division denying him a lien arising from a levy of execution *258 upon rights and credits of William Brancatella (Brancatella) in and to certain funds in the possession of the City of Bayonne, and of Jacob Drogin (Drogin), trustee, and granting Frank Carpenter, trading as Frank Carpenter Company (Carpenter), a lien upon said funds.
On or about October 14, 1954 Brancatella entered into a contract with Bayonne for the construction of a municipal swimming pool and bath house. The contract provided, inter alia:
"The Contractor will be paid in monthly approximate estimates for work satisfactorily completed and approved by the Engineer, less ten percent (10%) retained for repairs and less any amount paid by the Municipality by reason of the Contractor having failed to assume the obligations and responsibilities required by this contract.

* * * * * * * *
The Contractor shall guarantee all labor and materials for a period of one year from the date of acceptance of the work by the Municipality, making all needed repairs on the work as it progresses and during this period of one year, except those due to ordinary wear and tear. He agrees that during said period of one year, the Municipality may retain, out of moneys payable to him under this agreement, the sum of five percent (5%) of the amount of the contract; and that, should he fail to make the necessary repairs at once after due notice from the Engineer, the Municipality may expend the same or so much thereof as may be required in making the aforesaid needed repairs; provided, however, that in case of emergency, where in the opinion of the Engineer it would cause serious loss or damage, the Municipality may make repairs without previous notice and at the expense of the Contractor.

* * * * * * * *
Upon receipt of written notice that the work is completed and ready for final inspection and acceptance, the Engineer shall promptly make such inspection. When he finds the work acceptable as specified and contracted for, the Engineer shall promptly issue a final certificate to the effect that the work provided for under this contract has been completed and accepted by him, and the entire balance found to be due to the Contractor shall be paid to the Contractor within thirty days of the date of the final certificate.
The entire balance found to be due to the Contractor shall consist of the difference between the total value of work satisfactorily completed and accepted and the sum of the monthly payments, less five percent retained for repairs as set forth above, and less any amounts paid out by the Municipality by reason of the Contractor having *259 failed to assume the obligations and responsibilities as described in this contract.
The date of acceptance shall be the date of the issuance of the final certificate by the Engineer, to the effect that the work has been completed and accepted by him."
By resolution adopted January 17, 1956, Bayonne terminated the contract, alleging various breaches by Brancatella.
Some time between January 17, 1956 and April 3, 1956, Drogin, legal assistant of Bayonne, and the Mayor of Bayonne conferred with Brancatella concerning his inability to obtain labor and materials for the completion of the work required under the contract and were advised that because of his financial difficulties he could not obtain further labor or materials without a guarantee of payment from Bayonne. After additional conferences between Drogin, the mayor, the city engineer and various materialmen and labor representatives, assurances were given to the materialmen and laborers that they would be paid for future labor performed and materials furnished. Brancatella agreed that payments for the work as it progressed should thereafter be made by warrants drawn to the joint order of Brancatella and "Jacob Drogin, Trustee." On April 3, 1956 Bayonne rescinded its action of termination and authorized Brancatella to proceed with the completion of the contract.
On April 19, 1956 plaintiff, having theretofore obtained a judgment in the amount of $1,592.75, with costs and interest, against Brancatella upon a cause of action not arising under the Brancatella-Bayonne contract, caused a levy to be made upon monies due or to become due under said contract. The municipality had in its possession on that date the sum of $3,899.07, being the total of monthly retentions of ten per cent of each prior estimate, as provided in the contract.
Upon certification of the city engineer of the completion of various items of work done by Brancatella, the governing body of Bayonne, by resolutions, authorized five separate payments between May 8, 1956 and June 26, 1956 to Brancatella *260 and Drogin, trustee, in the total sum of $31,001.04. Each resolution provided that "* * * the said warrant be turned over to the said Jacob Drogin to be paid to the persons entitled to payment thereof." The funds so received were deposited in an account denominated "City Pool Account Special" and subject to withdrawal upon the signature of Jacob Drogin, trustee. There remains in said account a balance of $270.94.
Subsequent to April 19, 1956 and prior to June 15, 1956, Frank Carpenter sold and delivered to Brancatella various items of supplies for the swimming pool locker rooms, at a cost of $4,977.14, for use in connection with the Brancatella-Bayonne contract. He has received no payment on account thereof.
The swimming pool was opened to the public on or about June 15, 1956.
On June 16, 1956 the city engineer certified to the city commission of Bayonne that Brancatella had "satisfactorily completed 100% of his contract," and was entitled to the payment of $12,155.31, being the balance due therefor. This certificate exhibits that Bayonne retained $3,208.45 under its final five per cent retention, which sum the municipality still retains.
On February 11, 1957 Carpenter filed a notice of municipal mechanics lien with Bayonne.
Plaintiff filed suit seeking to impress a first lien, arising from the above levy, on the funds so remaining in the hands of Drogin and Bayonne. Carpenter, by way of cross-claim, sought to establish a prior lien upon those funds by virtue of (1) Municipal Mechanics Lien Act, N.J.S. 2A:44-125 et seq.; (2) Municipal Trust Fund Act, N.J.S. 2A:44-148 (misnumbered 2A:44-147); (3) General Equitable Principles, or (4) Municipal Bond Act, N.J.S.A. 40:1-85.
After trial, judgment was entered directing that Drogin pay to Carpenter the balance of $270.93 remaining in his hands, and that Bayonne pay to Carpenter the sum of $3,259.91. Plaintiff appeals.

*261 I.
We shall first consider plaintiff's claimed priority.
There is absent any proof that there were any funds due Brancatella for current work on his contract on April 19, 1956, except the retained percentage of $3,899.07.
Plaintiff's levy was upon Brancatella's rights and credits under N.J.S. 2A:17-57 to 63. Its rights to payment can rise no higher than Brancatella's rights under the contract of October 14, 1954.
For rights and credits to be subject to levy and execution they must not only be liquidated but they must represent certain and existing debts. A debt which is uncertain and contingent is not subject to levy. Although the payment of an existing debt need not be presently demandable, it must be fully due and owable in futuro. A debt, for present purposes, may be due although not immediately payable and although it could be defeated by conditions subsequent or be reducible by an offset of the debtor. Molloy v. Prudential Ins. Co. of America, 129 Conn. 251, 27 A.2d 387 (Sup. Ct. Err. 1942); 7 C.J.S. Attachment § 16, p. 206; 38 C.J.S. Garnishment § 87, p. 290; Terry v. Owatonna Canning Co., 119 N.J.L. 455 (E. & A. 1938); Cohen v. Cohen, 126 N.J.L. 605 (Sup. Ct. 1941); Vaccaro v. Sauta, 131 N.J.L. 136 (Sup. Ct. 1944).
At the time of plaintiff's levy none of the monies subsequently paid to Drogin, trustee, and Brancatella were due and owing. The debts, in satisfaction of which those payments were made, were then contingent upon performance of additional work or the furnishing of additional material by Brancatella as required by the terms of his contract with Bayonne. The creation of any further debt from Bayonne was uncertain. It follows that there was no valid levy on the funds which became due to Brancatella for work performed or materials furnished subsequent to April 19, 1956. Plaintiff, therefore, has no lien on the balance remaining in Drogin's hands.
*262 Insofar as the retained percentage of $3,208.45 remaining in Bayonne's custody is concerned, a different result eventuates. When the levy was made on April 19, 1956, Bayonne had in its hands monies due Brancatella in the amount of $3,899.07. This represented ten per cent of the monies due Brancatella for "work [theretofore] satisfactorily completed" by him under the contract. This sum was retained to compensate the municipality for "repairs" to the work so completed and for "any amount paid by the Municipality [Bayonne] by reason of the Contractor [Brancatella] having failed to assume the obligations and responsibilities required by this contract." Bayonne was indebted to Brancatella on April 19, 1956 in the amount of $3,899.07. This debt was certain and liquidated. It was subject only to a possible offset for repairs required to be made and for noncompliance with the obligations and responsibilities required under the contract between the date of retention and the final completion and acceptance of the work performed. One-half of said $3,899.07 was payable to Brancatella, subject to the foregoing possible offset, within 30 days after certification by the city engineer that the work called for under the contract had been finally completed as "specified and contracted for" and the remaining balance was payable to Brancatella one year after such acceptance, subject only to such possible additional offsets. Plaintiff had a valid levy upon $3,899.07 on April 19, 1956. There is no proof that there was any offset against the ten per cent fund prior to final acceptance. The levy and the lien arising therefrom to the extent of at least one-half of this sum ($1,949.54), which was transferred to the five per cent fund retained by Bayonne upon final acceptance, attached to that fund. Plaintiff has a valid first lien on the fund remaining in the custody of Bayonne to the extent of $1,949.54 for the satisfaction of his judgment.
As to the monies remaining in the hands of Drogin, the contrary results. All such monies were paid to Drogin for work actually completed by Brancatella pursuant to the *263 terms of his contract with Bayonne. Drogin was the alter ego of Brancatella for the disbursement of those monies to persons who had furnished labor or materials in furtherance of his contract. To all intents and purposes this was a payment to Brancatella. Cf. Fidelity Deposit Co. of Maryland v. McClintic Marshall Corp., infra. The funds in Drogin's custody as trustee are charged with a trust in favor of Carpenter.
I am not passing upon any possible liability of Bayonne for eventually paying the balance of $1,949.53 to Brancatella as this question is neither raised nor argued.
It becomes necessary to determine the status of Carpenter's claim to the funds. As above noted, he advanced four alternative theories in substantiation of his position. I shall first consider the conclusion of the majority that under general equitable principles the monies remaining in the hands of Bayonne were a trust fund primarily for the benefit of Carpenter.

II.

GENERAL EQUITY.
Carpenter is attempting to establish a materialman's lien on the funds, under one or more of the above listed theories, whether designated by him as a "lien" or a "trust." He is thus seeking a lien unknown to the common law.
The court, in Friedman v. Stein, 4 N.J. 34, 40 (1950), said:
"The mechanic's and materialman's liens had their genesis in the civil law. They are unknown to the common law; and they have had no recognition in equity except as prescribed by statute. South Fork Canal Co. v. Gordon, 6 Wall. 561, 18 L.Ed. 894 (1868); Van Stone v. Stillwell & Bierce Mfg. Co., 142 U.S. 128, 12 S.Ct. 181, 35 L.Ed. 961 (1891); Brescia Construction Co. v. Walart Construction Co., 264 N.Y. 260, 190 N.E. 484, 93 A.L.R. 1148 (1934). Thus it is that these liens are exclusively statutory in origin; and, being in derogation of the common law, the provisions of the statute giving rise to the lien are to be strictly construed."
*264 (The rule thus enunciated is applicable to and pervades each of the grounds urged by Carpenter and will not, therefore, be repeated in the following detailed discussion of his additional individual contentions.)
Generally, in the absence of statute, one who furnishes labor or material for a building or any structure which is part of the land has no lien, legal or equitable, on the land, the structure or the contract price. This applies to municipalities as well as individuals. See Fidelity & Deposit Co., Maryland v. McClintic Marshall Corp., 115 N.J. Eq. 470 (Ch. 1934), affirmed on opinion below 117 N.J. Eq. 440 (E. & A. 1935); Friedman v. Stein, supra.
Carpenter relies upon Goodwillie v. City of Bayonne, 2 N.J. 88 (1949), and National Surety Corp. v. Barth, 11 N.J. 506 (1953), as authority for its argument that general equitable consideration requires that the monies retained by Bayonne constitute a trust fund for laborers and materialmen.
In Goodwillie, the funds impressed with a trust obligation were obtained "through a United States PWA outright grant of $1,785,000 and a municipal bond issue for $2,430,000." The opinion discloses, 2 N.J., at pages 90-93, that:
"The city * * * agreed to devote all moneys received from the grant and bond issue to the construction of the terminal and to deposit them in a special `Construction Account' and to pay therefrom all the legal and engineering services, administrative and overhead expenses incurred by the company.

* * * * * * * *
The contract under which the federal funds became available provided that the grant, as well as the proceeds of the city's own bond issue, was required to be placed in a special `Construction Account' to be used solely for the construction of the terminal. These funds were received and set aside by the city for specific purposes. When accepted by the city, they became earmarked and impressed with a trust obligating the city to expend them for the designated uses. Mayor, etc. of City of Hoboken v. Ivison, 29 N.J.L. 65 (Sup. Ct. 1860); Maurello v. Broadway Bank & Trust Co., 114 N.J.L. 167 (E. & A. 1935); Borough of Dcal v. Asbury Park and Occan Grove Bank, 118 N.J. Eq. 297 (E. & A. 1935); Hopper v. New Jersey Title Guarantee & Trust Co., 127 N.J. Eq. 1 (E. & A. 1940).

* * * * * * * *
*265 The deposits so made and subsequent additions thereto became impressed with the obligation to be disbursed only as agreed upon. The city, having failed to establish any equitable basis for not making the payments according to the designated purposes, must comply with the order entered below." (Emphasis supplied)
In National Surety Corp., supra, the court said, 11 N.J., at pages 513-515:
"Thus there are three sources from which these funds for public housing improvements arise  namely federal government appropriations, state appropriations out of the general state fund, and moneys to be raised from a bond issue. On public referendum a bond issue was approved. Chapter 324 of the Laws of 1946, pages 1363-1372, N.J.S.A. 55:14G-23 note, adopted at the general election provided in part:
`11. The proceeds from the sale of the bonds, exclusive of accrued interest and premiums, and all interest on deposits received from depositories, shall be paid to the State Treasurer and be held by him in a separate fund, and he deposited in such depositories as may be selected by him to the credit of the fund, which fund shall be known as the "State Housing Fund." All accrued interest and premiums from the sale of bonds except as provided in section fourteen hereof, together with interest received from depositories of such funds, shall be held by the State Treasurer to the credit of the said State Housing Fund.
"`12. The moneys in the said State Housing Fund are hereby specifically dedicated to providing housing for veterans of World War II and other people of the State and shall be disposed of in accordance with this act through such agencies or by such means as the Legislature may by act provide for such purpose. Such fund shall be held for the demand of the Commissioner of Economic Development or his successor, and shall be drawn upon and disbursed on his order, as other funds are now disbursed from the State Treasury. At any time prior to the issuance and sale of bonds under this act the State Treasurer is hereby authorized to transfer from any available money in the treasury of the State to the credit of the State Housing Fund such sum as may be deemed necessary for the purposes of this act by the Commissioner of Economic Development, which said sum so transferred shall be returned to the treasury of this State by the treasurer thereof from the proceeds of the sale of the first issue of bonds.' (Emphasis added.)
The Legislature clearly intended to set aside all moneys received from these three sources and to earmark them for the purposes of public housing. The money was not available for any use except in furtherance of the policies of the act.

* * * * * * * *
*266 In Mayor and Council of Hoboken v. Ivison, 29 N.J.L. 65 (Sup. Ct. 1860), the Supreme Court stated at page 67:
`Upon general principles of law, a fund raised for a specific purpose, and placed in the hands of an officer for such specific purpose, cannot lawfully be applied to any other. Any such other appropriation would be a violation of the trust, and so contrary to law.'
Fidelity and Deposit Company of Maryland v. McClintic-Marshall Corporation, 115 N.J. Eq. 470 (Ch. 1934), affirmed in a per curiam opinion, 117 N.J. Eq. 440 (E. & A. 1935), is distinguishable; in that case no fund was set aside [emphasis supplied], such as we have here.
Although these cases did not involve funds held by the State the principle is still the same. Clearly funds have been appropriated and dedicated for a specific purpose by the United States Congress, the New Jersey Legislature, and the voters of the State of New Jersey. A special fund labelled `State Housing Fund' has been established and all moneys deposited therein are earmarked for the purposes of emergency housing. Withdrawals can be made only upon the signature of the State Commissioner of Taxation and Finance on vouchers certified or approved by the Administrator. The materialmen and laborers, and therefore National Surety Corporation in view of its subrogation rights, have an equitable interest in these funds. Such an interest cannot be defeated by the State by the exercise of a setoff based upon the personal debt of the contractor totally unrelated to the work performed in furtherance of the purposes for which the fund was created."
In each instance special bank accounts were created and the monies to pay for the contemplated improvements deposited therein. By virtue of contract and legislative fiat the funds so deposited were impressed with a trust to be used only in paying for the authorized construction.
The matter sub judice is distinguishable from Goodwillie and National Surety Corp., supra, in that no contract or statute required that the funds be segregated from general municipal funds and deposited in a separate account; that the funds required for the payment of the improvement did not come from monies especially earmarked and set aside for that purpose; and that no special deposit was actually made of monies in advance of the execution of the Brancatella contract.
There is nothing in the facts of the case sub judice to distinguish the contract, the source of the funds, the accounting *267 records and the payments provided for the completion of the work under the contract from the ordinary municipal contract, the source of the funds, the accounting records and the payments provided for the completion of the work under the contract. In every instance where a municipality has authorized a public improvement and provided funds therefor recognized bookkeeping and accounting methods require an entry in the municipal financial records reflecting a separate appropriation account disclosing the amount of monies allotted for such purposes. This is not to say, paraphrasing the language of National Surety Corp. v. Barth, supra, 11 N.J., at page 515, that a separate "fund * * * has [thereby] been established and all moneys deposited therein * * * earmarked for the purposes" of undertaking the public improvement. I am fearful that the result attained by my colleagues under the facts here present might lead to the conclusion that a laborer or materialman performing work or furnishing material for the completion of every public improvement has a preferential "equitable lien" on monies due or to grow due to the prime contractor. Such a lien, as above noted, was unknown to both equity and the common law. Were a laborer or materialman entitled to such a lien there would be no necessity for the several remedial statutes passed by the Legislature, above quoted, for their protection.
It becomes necessary to consider Carpenter's additionally asserted grounds.

III.

MUNICIPAL MECHANICS LIEN.
N.J.S. 2A:44-128 provides, in part:
"Any person who, as laborer, mechanic, materialman, merchant or trader, or subcontractor, in pursuance of or conformity with the terms of any contract for any public improvement made between any person and a public agency as defined in section 2A:44-126 of this title and authorized by law to make contracts for the making of *268 public improvements, performs any labor or furnishes any materials, including the furnishing of oil, gasoline or lubricants and vehicle use, toward the performance or completion of any such contract, shall, on complying with the provisions of sections 2A:44-132 and 2A:44-133 of this title, have a lien for the value of the labor or materials, or both, upon the moneys due or to grow due under the contract and in the control of the public agency, to the full value of the claim or demand. * * *."
N.J.S. 2A:44-132 provides:
"A lien claimant may, at any time before the whole work to be performed by the contractor for the public agency is either completed or accepted by resolution of the public agency, or within 60 days thereafter, file with the chairman or other head officer or with the secretary or clerk of the public agency, a notice of lien claim verified by oath of the claimant or his agent." (Emphasis supplied)
A notice of lien claim must be filed within 60 days either of the completion of the work called for under the contract with a public agency or of the acceptance thereof by such agency. The requirement is in the disjunctive.
In Hildreth Granite Co. v. Hudson Freeholders, 87 N.J. Eq. 316 (E. & A. 1917), the court had before it the then Municipal Mechanics Lien Law, 3 Compiled Statutes, § 2, p. 3315, which reads, in part:
"At any time before the whole work to be performed by the contractor for any such city, town, township or other municipality is completed or accepted by said city, town, township or other municipality, and within fifteen days after the same is so completed or accepted, any claimant may file * * * notices * * *." (Emphasis supplied)
The court said, at page 319:
"The pertinent provision of the statute which has been above recited, is that within 15 days after the work `is completed or accepted' the claimant may file with the chairman, etc., his notice of claim. It is to be observed that the phrase `completed or accepted' is in the disjunctive, and is intended, as we think, to meet two different conditions. One, where the contract has been fully performed by the contractor; and, the other, where he has defaulted in full performance, *269 but the municipality has accepted the work so far as it has been done. In the first case, that is, where the work has been completed, the claimant is required to file his notice within 15 days after the date of completion. In the other case, where the work has not been completed, where the contractor has abandoned it, but where what has been done by him is accepted by the municipality, the claimant must file his notice within 15 days after such acceptance. In the pending case the work, as has already been stated, was completed on the 31st of October. In order to give validity to the appellants' notice, they were required to file it on or before the 15th of November. They failed to do so until the expiration of 10 days beyond that time. We agree with the Vice Chancellor, therefore, that the statutory provision was not complied with by them, and that they were not entitled to the lien which they claimed."
What was said in Hildreth, supra, is applicable to the present statute.
The question of completion is a factual issue. The public has been using the facilities of the swimming pool and bath house since June 15, 1956. On June 26, 1956 the city engineer of Bayonne issued his final certificate that Brancatella "* * * has satisfactorily completed 100% of his contract, * * *." This constituted a certificate that "the work has been completed and accepted by him." The contract provided that acceptance should be the date of the issuance of such a certificate. The municipality, by the inclusion of that provision in the contract, obviated the necessity of acceptance by formal resolution of the governing body. We find, therefore, that Brancatella had both completed the work called for under his contract and that there had been an acceptance thereof by Bayonne no later than June 26, 1956. Defendant's notice was filed on February 11, 1957, more than 60 days after the completion date and was therefore insufficient to give rise to a lien under the express terms of the statute.

IV.

MUNICIPAL TRUST FUND.
N.J.S. 2A:44-147 (which should be numbered 2A:44-148) provides:
*270 "All money paid by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid."
This statute applies only to funds actually paid by a municipality to a contractor engaged in constructing a public improvement. No trust is impressed upon funds in the hands of the municipality prior to payment to such contractor. National Surety Corp. v. Barth, supra.
Carpenter, therefore, has no lien upon the monies remaining in the hands of Bayonne.

V.

MUNICIPAL BOND ACT, N.J.S.A. 40:1-85.
N.J.S.A. 40:1-85 reads:
"The proceeds of the sale of any obligations issued under this article shall be applied only to the purposes for which such obligations are authorized, except that if for any reason any part of such proceeds are not necessary for such purposes, the said part shall be transferred to any reserve or sinking fund for the retirement of debt or may by resolution of a county board of chosen freeholders adopted pursuant to the provisions of subtitle two of Title 40 of the Revised Statutes or by ordinance of a municipality adopted pursuant to the provisions of chapter forty-nine of Title 40 of the Revised Statutes be appropriated to and used to finance the cost of any other purpose or purposes which have the same or a longer period of usefulness and which this act authorizes to be financed by the issuance of bonds."
N.J.S.A. 40:1-85 is not applicable. That statute does not create a fund for the benefit of laborers or materialmen furnishing labor or materials for the public improvement for the completion of which municipal obligations were authorized *271 to be issued and sold. Nor does it create a special lien upon the proceeds of the sale of such municipal obligations for the benefit of such laborers or materialmen. The purpose and intent of that statute is to prevent the use by the municipality of the proceeds of the sale of municipal obligations for any purpose other than for the completion of the public improvement for which they were specifically authorized and to make certain that the proceeds are so applied. A payment by a municipality of some portion or all of the proceeds of a sale of its obligations to a claimant of a contractor where the debt due the contractor arose under a contract for the construction of the specific public improvement for the accomplishment of which the issuance and sale of said obligations were authorized is a constructive application of the proceeds of the sale of said obligations to the authorized purpose. This follows whether the claimant's interest arose under or in connection with that contract or otherwise.
Additionally, the original record with which we were supplied failed to disclose the source of the funds employed in the payment of the improvement. As a result of the exercise of our original jurisdiction, R.R. 1:5-4, made applicable to the Appellate Division by R.R. 2:5, counsel have submitted this missing proof. That proof discloses that the funds used fall into three categories; (1) general funds of the municipality provided for in annual budget appropriations; (2) monies raised by subscription of and donation by the general public; (3) monies resulting from the issuance and sale of municipal bonds. The funds remaining in the hands of Bayonne are not traceable to the proceeds of the sale of municipal obligations and hence N.J.S.A. 40:1-85 is in any event not applicable.
Carpenter has no lien on the funds in the hands of Bayonne by virtue of N.J.S.A. 40:1-85.
I would reverse and remand consistent with the foregoing conclusions.