69 N.J. Super. 70 (1961)
173 A.2d 527
THE BOARD OF EDUCATION OF THE CITY OF PLEASANTVILLE, IN THE COUNTY OF ATLANTIC AND STATE OF NEW JERSEY, PLAINTIFF,
v.
EARLE R. AIKEN, TRADING AS AIKEN'S UPHOLSTERING CO.; HARTFORD ACCIDENT AND INDEMNITY COMPANY, A CORPORATION; REINHART INC., A CORPORATION OF THE STATE OF PENNSYLVANIA; WILLIAM J. LICHTENBERGER, TRADING AS W.J. LICHTENBERGER CO.; ROSE BEDDING CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY; EMPIRE TEXTILE CORPORATION, A CORPORATION; NATIONAL TEXTILES INC., A CORPORATION; SAMUEL G. SCHIFFER; ATLANTIC COUNTY DISTRICT COURT; LOUIS DeFEO, SERGEANT-AT-ARMS, ATLANTIC COUNTY DISTRICT COURT, AND THE UNITED STATES OF AMERICA, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 2, 1961.
*72 Mr. Chester A. Weidenburner, United States Attorney (Mr. Frank J. Ferry, Assistant United States Attorney, appearing), attorney for the United States of America, by intervention.
Mr. Robert Neustadter appeared for defendant, Reinhart, Inc. (Messrs. Perskie and Perskie, attorneys).
Mr. I. Charles Lifland, attorney for defendant, Hartford Accident and Indemnity Company.
Mr. Harry Miller, attorney for judgment creditor.
Mr. Saul C. Gorson, attorney for judgment creditor.
Mr. James N. Butler appeared for judgment creditor (Messrs. Moore & Butler, attorneys).
WICK, J.S.C.
This matter comes before the court for determination of priorities as to funds now held by the Clerk of this court, resulting from an interpleader action by plaintiff.
On January 31, 1958 the United States assessed Earle R. Aiken, trading as Aiken's Upholstering Company, in the sum of $3,383.91 for arrearages on unpaid withholding taxes for the years 1955, 1956, and 1957. After making three unsuccessful demands upon Aiken for payment, a federal tax lien was filed with the Clerk of Atlantic County on March 21, 1958.
On June 21, 1958 Aiken contracted with the Board of Education of the City of Pleasantville for the manufacture, repair and cleaning of drapes to be used in the auditorium of the Senior High School. Pursuant to the requirements of N.J.S. 2A:44-143 et seq., Aiken and the Hartford Accident and Indemnity Co. (hereafter referred to as Hartford) executed a surety bond in favor of the Board of Education, materialmen, and laborers under the contract. *73 Reinhart, Inc. (hereafter referred to as Reinhart) supplied Aiken with material necessary for this contract. As security for these materials, Aiken executed to Reinhart an assignment of $1,350 due him from the Board of Education upon completion of this contract. This assignment was subsequently filed with the Secretary of the Board of Education on August 9, 1958. However, despite the advance of Reinhart, Aiken was still unable to complete the contract with his own resources. Upon notice from the Board of Education of his imminent default, Hartford, on August 29, 1958, advanced the sum of $425 by draft payable jointly to Aiken and Hygienic Sanitation Co., Inc., a materialman, to enable the contract to be completed. The completed work was then accepted by the Board of Education on September 2, 1958. However, prior to this acceptance, five judgment creditors of Aiken had, on August 4 and August 25, 1958, attempted to make executions under their respective judgments upon the Board of Education. The claims upon which these judgments were rendered did not arise from the performance of the contract between Aiken and the Board of Education.
Upon acceptance of this work on September 2, 1958, the Board of Education, after deduction of part payments, owed Aiken the sum of $3,350. Then, on September 5, 1958, the United States served a levy under its federal tax lien against Aiken upon the Board for these funds. The Board of Education, because of these various claims filed with it for these funds, filed a complaint in interpleader, and as a result of an order entered therein, these funds were deposited with the Clerk of this court.
All the claimants to these funds, with the exception of the United States which has intervened, are parties defendants to this action.
Not only do Reinhart, Hartford, and the five execution creditors each claim priority, but likewise does the United States. The United States contends that it is entitled to priority under 26 U.S.C.A. § 6321 (Internal Revenue Code of 1954) which provides:
*74 "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." (Emphasis added)
The problem of determining the priorities between federal tax liens and other claims made under state law against the taxpayer has long been troublesome. It must be recognized that the rights of the United States under § 6321 cannot extend beyond those of the taxpayer whose alleged right to property is sought to be levied. The lien of the United States is no greater than the right of Aiken to these funds. Bankers Title & Abstract Co. v. Ferber Co., 15 N.J. 433 (1954); Damato v. Leone Construction Co., 41 N.J. Super. 366 (App. Div. 1956). Therefore a basic issue herein is whether Aiken had any "property" or "rights to property" in these funds.
In regard to this issue the United States Supreme Court has in recent decisions established the "choice of law" criteria to be used in making this determination. In Aquilino v. United States, 363 U.S. 509, at pages 512-514, 80 S.Ct. 1277, at page 1280, 4 L.Ed.2d 1365 (1960), the court stated:
"The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had `property' or `rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that `in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property. * * * sought to be reached by the statute.' * * * The application of state law in ascertaining the taxpayer's property rights and of federal law in reconciling the claims of competing lienors is based both upon logic and sound legal principles. This approach strikes a proper balance between the legitimate and traditional interest which the State has in creating and defining the property interest of its citizens, and the necessity for a uniform administration of the federal revenue statutes." *75 See also United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960); United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958).
Thus it is necessary to examine the law of New Jersey to resolve the question of priorities herein. Hartford, the surety company, claims to be subrogated to both the rights of Hygienic Sanitation Co., Inc. and the Board of Education to the funds in question. As counsel has correctly stated in his brief, the right of subrogation of the surety exists where it has paid claims guaranteed by it on behalf of the contractor. Key Agency v. Continental Casualty Co., 55 N.J. Super. 58 (Ch. Div. 1959), affirmed 31 N.J. 98 (1959); Stulz-Sickles Co. v. Fredburn Construction Corp., 114 N.J. Eq. 475 (Ch. 1933). On August 29, 1958 Hartford made a payment of $425 to Aiken and Hygienic Sanitation Co., Inc., jointly. (Hygienic Sanitation Co., Inc. was a materialman under the contract herein.) By virtue of that payment, Hartford stands in the position of the materialman, Hygienic Sanitation Co., Inc. However, Hartford has made no payments to the Board of Education, nor has the Board made any claims for any such payment. Aiken did not default under his contract with the Board, but in fact did fulfill his obligations to the satisfaction of the Board. If Aiken had defaulted and Hartford was required to pay the Board directly for the default, then Hartford would be subrogated to the rights of the Board. In absence of such facts, the Board has no claims against this fund which can be subrogated to Hartford; therefore, Hartford's claim herein is solely that of a materialman.
Although the United States contends that Reinhart has made no claim as a materialman, the court is satisfied that the pleadings do sufficiently reflect Reinhart's position as a materialman. In addition, Reinhart also took an assignment of $1,350 of the funds to become due Aiken from the Board upon the acceptance of the work. This assignment was not executed until August 9, 1958. The federal tax *76 lien had been filed on March 21, 1958, some four months prior. In Bankers Title & Abstract Co. v. Ferber Co., supra, involving facts similar to those herein, the Supreme Court of New Jersey held that a federal tax lien filed before an assignment was made is entitled to priority over the assignment. In that case, as herein, the monies were not yet earned at the date of the lien or the assignment. In view of the result reached by the Supreme Court in the Bankers Title case, this court must hold that Reinhart, as assignee, cannot be given priority over the United States.
The claim of Reinhart and Hartford as unpaid materialmen is much more difficult to adjudicate. Neither has filed a notice of lien claim as provided by the Municipal Mechanic Lien Law (N.J.S. 2A:44-125 et seq.). However, both contend that these monies constitute an equitable trust fund from which all unpaid materialmen must be paid before these monies can be used for any other purpose. Until these claims are paid, according to this theory, Aiken has no right to claim these monies; and since the rights of the United States, whose lien attaches to only the property of Aiken, cannot extend beyond those of Aiken, the materialmen must be given priority.
Several cases are cited as showing the application of such a theory by the courts of this State. In Goodwillie v. City of Bayonne, 2 N.J. 88 (1949), the plaintiffs brought an action against the City of Bayonne on assigned claims for services rendered to the general contractor under a municipal contract. Bayonne and the general contractor had entered into an agreement for construction of certain buildings, the cost of which was to be financed "through a United States PWA outright grant of $1,785,000 and a municipal bond issue for $2,430,000." The city sought to offset other claims not related to this contract against the amount due the contractor. The Supreme Court held that the city could not avoid payment of the assigned claims arising out of this construction contract by applying funds to the city's claims against the contractor which did not arise out of *77 the construction. However, in so holding, Justice Wachenfeld, speaking for the court, noted at page 90, as follows:
"The city in return agreed to devote all moneys received from the grant and bond issue to the construction of the terminal and to deposit them in a special `Construction Account' and to pay therefrom all the legal and engineering services, administrative and overhead expenses incurred by the company."
On page 92, he concluded that:
"The contract under which the federal funds became available provided that the grant, as well as the proceeds of the city's own bond issue, was required to be placed in a special `Construction Account' to be used solely for the construction of the terminal. These funds were received and set aside by the city for specific purposes. When accepted by the city, they became earmarked and impressed with a trust obligating the city to expend them for the designated uses. Mayor and Council of Hoboken v. Ivison, 29 N.J.L. 65 (Sup. Ct. 1860); Maurello v. Broadway Bank & Trust Co., 114 N.J.L. 167 (E. & A. 1935); Borough of Deal v. Asbury Park and Ocean Grove Bank, 118 N.J. Eq. 297 (E. & A. 1935); Hopper v. New Jersey Title Guarantee & Trust Co., 127 N.J. Eq. 1 (E. & A. 1940)."
In National Surety Corp. v. Barth, 20 N.J. Super. 100 (Ch. Div. 1952), affirmed 11 N.J. 506 (1953), the contractor defaulted on public housing contracts, and thus the surety on his performance bonds was required to arrange for the completion of these contracts. The surety then brought an action in the Chancery Division seeking to obtain exoneration to the extent that the contractual proceeds still held by the Administrator of the Public Housing and Development Authority of the State of New Jersey might be applied to the demands of unpaid materialmen and subrogation to the extent that it had paid certain claims against the defaulted contractor. The United States intervened, filing a claim for unpaid withholding taxes. The State of New Jersey sought to offset its claim against the defaulted contractor for unpaid unemployment and disability tax obligations against the funds still retained by the Administrator. *78 Judge Stanton, in the Chancery Division, held that the claim of the United States was no greater than that of the defaulted contractor and thus was subordinated to the claims of the materialmen and laborers, except to the sums retained by the contractor as withholding of wages for labor performed under this contract with the State of New Jersey. The court refused to permit any setoff by the State of New Jersey, holding that the funds in question are "a trust fund for the benefit of those whose work, material and equipment have made it payable." (20 N.J. Super., at page 108)
Only the State of New Jersey appealed, contending that no trust should be imposed upon the funds still retained by the Administrator. The Supreme Court, at 11 N.J. 506, affirmed the Chancery Division Judge's decision. In so holding, Chief Justice Vanderbilt, after examining the policy of the legislation authorizing the Administrator to enter into such contracts and the sources of funds to be used therein, said at page 513 as follows:
"Thus there are three sources from which these funds for public housing improvements arise  namely federal government appropriations, state appropriations out of the general state fund, and moneys to be raised from a bond issue. On public referendum a bond issue was approved. Chapter 324 of the Laws of 1946, pages 1363-1372, N.J.S.A. 55:14G-23 note, adopted at the general election provided in part:
`11. The proceeds from the sale of the bonds, exclusive of accrued interest and premiums, and all interest on deposits received from depositories, shall be paid to the State Treasurer and be held by him in a separate fund, and be deposited in such depositories as may be selected by him to the credit of the fund, which fund shall be known as the "State Housing Fund." All accrued interest and premiums from the sale of bonds except as provided in section fourteen hereof, together with interest received from depositories of such funds, shall be held by the State Treasurer to the credit of the said State Housing Fund.
12. The moneys in the said State Housing Fund are hereby specifically dedicated to providing housing for veterans of World War II and other people of the State and shall be disposed of in accordance with this act through such agencies or by such means as the Legislature may by act provide for such purpose. Such fund *79 shall be held for the demand of the Commissioner of Economic Development, or his successor, and shall be drawn upon and disbursed on his order, as other funds are now disbursed from the State Treasury. At any time prior to the issuance and sale of bonds under this act the State Treasurer is hereby authorized to transfer from any available money in the treasury of the State to the credit of the State Housing Fund such sum as may be deemed necessary for the purposes of this act by the Commissioner of Economic Development, which said sum so transferred shall be returned to the treasury of this State by the treasurer thereof from the proceeds of the sale of the first issue of bonds.' (Emphasis added.)
The Legislature clearly intended to set aside all moneys received from these three sources and to earmark them for the purposes of public housing. The money was not available for any use except in furtherance of the policies of the act."
The Chief Justice continued, on page 514:
"Although these cases did not involve funds held by the State the principle is still the same. Clearly funds have been appropriated and dedicated for a specific purpose by the United States Congress, the New Jersey Legislature, and the voters of the State of New Jersey. A special fund labelled `State Housing Fund' has been established and all moneys deposited therein are earmarked for the purposes of emergency housing. Withdrawals can be made only upon the signature of the State Commissioner of Taxation and Finance on vouchers certified or approved by the Administrator. The materialmen and laborers, and therefore National Surety Corporation in view of its subrogation rights, have an equitable interest in these funds. Such an interest cannot be defeated by the State by the exercise of a setoff based upon the personal debt of the contractor totally unrelated to the work performed in furtherance of the purposes for which the fund was created."
A third case cited for the "equitable trust" doctrine is Picker v. City of Bayonne, 60 N.J. Super. 251 (App. Div. 1960), affirmed 33 N.J. 390 (1960). The City of Bayonne had adopted an ordinance for the construction of a swimming pool which was to be financed through sale of municipal bonds, cash loans from the city's capital account, and private cash contributions. The contractor originally hired to do the work defaulted; the city then rescinded the agreement with the contractor, and invoked the performance bond. However, in the interest of speeding construction and avoiding *80 litigation on the bond, the city agreed to renew the contract with the contractor pursuant to the understanding that Drogin, a member of the city's law department, was to receive payments under the contract and to disburse these funds to the unpaid suppliers and laborers of the contractor. Picker, a holder of a judgment based upon an antecedent debt of the contractor having no connection with the latter's contract with the city, then sought to satisfy his judgment out of funds retained by the city as security for the contractor's guarantee of the work for a period of one year. Carpenter, an unpaid creditor who supplied equipment necessary to complete the contract after the contract was reinstated by the city, also claimed priority to these funds. The Appellate Division, at 60 N.J. Super. 252, held that these funds constituted an equitable trust for the benefit of the laborers and materialmen on this project. The court noted the city financial records showed these funds to constitute a separate appropriation account; and also that a major portion of the funds allocated for this project were raised by municipal bond anticipation notes. In regard to these funds, the court said, at page 256, that:
"* * * dominant effect must be accorded the statutory directive that: `The proceeds of the sale of any obligations issued under this article shall be applied only to the purposes for which such obligations are authorized * * *.' N.J.S.A. 40:1-85."
Despite those facts, Judge (now Justice) Haneman strongly dissented, contending that the majority's conclusion had in effect rendered the various acts of remedial legislation for the protection of materialmen nugatory.
The Supreme Court, by a per curiam opinion at 33 N.J. 390, affirmed the Appellate Division's conclusion. However, in so affirming, the Supreme Court did not adopt the "equitable trust" theory used by the Appellate Division, but instead held that the agreement between the city and the contractor upon reinstatement of the contract constituted an informal oral agreement of express trust between the city *81 and the contractor for the benefit of the materialmen and laborers on this project. In conclusion, the court, at page 393, stated:
"We therefore do not reach the matter of an equitable trust derived from some allocation of the project moneys on the city's books, on which the majority of the Appellate Division based its decision, and express no opinion thereon."
Reinhart and Hartford, as materialmen, urged that the court herein is bound by the three above discussed decisions to conclude that the monies constitute an equitable trust fund for their benefit. The court does not agree. There are several very important factual distinctions between those cases and the case presently under consideration. First of all, in both the Goodwillie and the National Surety cases, the funds in question were actually physically segregated from the general municipal funds. As the court in both cases pointed out, special bank accounts were created and the funds to pay for the contemplated improvements were deposited therein. The affidavit of one John F. Gibson, Secretary of the Board of Education of the City of Pleasantville, reveals that there was no such segregation of the funds herein. Gibson only stated that, after the award of this contract to Aiken, an entry committing these funds to Aiken was made on the Board's books; and thereafter these funds could not be used for any other purpose. A mere book entry certainly must be considered to be far less evidential of a trust than the actual physical segregation of funds. Such a book entry allocating funds to a specific project would seem to be the necessary procedure to be followed in every instance of municipal improvement; and good municipal budgeting furthermore would dictate that these funds only be used for this contract. In the Picker case, however, the Appellate Division did hold that such an allocation of a project's monies on the city's books creates an equitable trust. But the Supreme Court significantly chose to affirm that result upon an express trust theory and, *82 in so affirming, refused to comment upon the equitable trust basis of the Appellate Division's opinion. There is no question that the funds herein are not the subject of an agreement of express trust as the Supreme Court found in the Picker case because there is no agreement, either oral or written, among the various parties herein that these funds were to be used for payment of labor and materials as in Picker. But, even ignoring the Supreme Court's opinion, the Picker case is still distinguishable from the facts herein.
In each of the above cases the source of the funds involved was an important, if not the determining, factor used by the courts to find an equitable trust. All the funds in the Goodwillie and the National Surety cases, and almost all in the Picker case, were raised by the public agencies through either contributions from the Federal Government or the State of New Jersey, or through the sale of bonds. In each instance, the courts found that these funds, because of their origin, could only be disbursed for the designated purpose for which they were obtained; and, as shown by the excerpts quoted above, the courts expressly relied upon these restrictions as a basis for the creation of a trust in those cases. However, there is nothing in the origin of the funds herein to indicate such a limitation. Gibson in his affidavit states that these funds were part of the Board of Education's appropriations under the general designation "Contract Service." There are no proofs indicating that those funds, when received by the Board, were in fact designated to be used for a specific purpose, and that purpose only. In short, these funds were part of a general appropriation to the Board of Education to be spent for the purposes as the Board itself felt needed.
In addition, Hartford cites Damato v. Leone Construction Co., supra, and Central Surety & Insurance Corp. v. Martin Infante Co., 272 F.2d 231 (3 Cir. 1959), in support of its claim. These cases are likewise distinguishable from that sub judice. Both cases hold that a surety, who has completed construction after the contractor has defaulted, *83 has priority over a federal tax lien against the contractor in regard to the contract proceeds. After the contractor has defaulted, he, under general contract law, has no legal rights to the contract price to which the federal lien could attach. The crucial factor to those decisions was the default by the contractor; herein, instead of a default, there was complete performance by Aiken and, therefore, under general contract principles, he is entitled to recover the contract price from the Board of Education.
Materialmen's liens, originally unknown to the common law, are exclusively statutory in origin. Friedman v. Stein, 4 N.J. 34 (1950); Fidelity & Deposit Co. of Maryland v. McClintic-Marshall Corp., 115 N.J. Eq. 470 (Ch. 1934). The materialmen herein have failed to invoke the statutory procedure provided to protect such claims. The United States contends that this failure is fatal to their claims. The court must agree. In Bankers Title & Abstract Co. v. Ferber Co., supra, the Supreme Court held that materialmen who had filed stop notices before the funds were distributed by the owner to the general contractor have priority over the claim of the United States under a federal tax lien against the contractor. However, in regard to the claims of one materialman who did not file his notice properly time-wise, the court held that the property right of the general contractor had matured, even to those funds still remaining in escrow, and, therefore, the federal tax lien must be given priority over the claim.
The materialmen contend the Bankers Title case is distinguishable from the case at bar because no public contract was involved there. Since a public contract is involved herein, the materialmen suggest that they should still be protected even though they have filed no lien claim. Apart from an equitable trust theory (which this court has previously discussed and found not to be applicable to the facts herein) this distinction cannot be well taken. The Legislature has, by adopting the "municipal mechanics' lien law" (N.J.S. 2A:44-125 et seq.) made a policy determination that materialmen *84 on public contracts should likewise file notices of lien claims if they seek a lien on the contractual proceeds. This legislation must be assumed to have a purpose. Unfortunately, the materialmen herein did not take advantage of this statutory procedure; therefore, they must suffer the legal consequences of their omissions.
The materialmen further argue the general equitable merits of their claims. There is no question that the funds in question arose solely through the efforts and financial advances made by these claimants. Now the United States claims the entire fund resulting from the materialmen's investment. However, these same factors were present in the Bankers Title case, but the Supreme Court still held it was necessary for a materialman to file a proper lien claim to prevail over a federal tax lien.
Undoubtedly if these funds had been paid to Aiken instead of interpleaded into this court, the funds would, under the Public Trust Act (N.J.S. 2A:44-147, which should be cited as 2A:44-148) constitute a trust for payment of all unpaid materialmen and laborers. The materialmen herein thus contend that the funds should, on deposit with this court, still constitute a trust fund for the payment of their claims. However, the specific language of the Public Trust Act limits its effect to monies paid by the governmental body to the contractor. See National Surety Corp. v. Barth, supra, wherein it was held that this act does not impress a trust upon funds still in possession of the State and not yet paid to the contractor. Admittedly, in this instance, the Legislature, by this limitation, has created a hiatus as far as the rights of these materialmen are concerned; however, to so do is legislative prerogative which cannot be usurped by this court. Furthermore the materialmen themselves could have avoided this situation if they had protected their claims by filing proper notices of lien claims.
The court must conclude the funds interpleaded into this court became the property of Aiken in the absence of *85 properly filed notices of lien claims by the materialmen. As the property of Aiken, the claim of the United States under its federal tax lien must be given priority over the claims of these materialmen.
The United States must also be given priority over the various judgment creditors of Aiken who attempted to levy on these funds. There was no judgment lien on these funds until delivery of a writ of execution to the sheriff or his legally appointed assistants. N.J.S. 2A:17-10. Prior to that, the United States had made the delinquent tax assessment against Aiken and filed its lien with the Clerk of Atlantic County; therefore, the claim of the United States, being prior in time, is entitled to priority over the claim of these judgment creditors.
Since the claim of the United States exceeds the total amount of funds interpleaded, it is unnecessary for the court to determine the priorities between these materialmen and the unpaid judgment creditors.
A judgment may be presented in accordance with these views.