**UNIVERSAL BONDING INSURANCE CO., North River Insurance Co., Westchester Fire Insurance Co., Appellants,**

v.

**GITTENS AND SPRINKLE ENTERPRISES, INC.,**
Appellee,

**Gittens and Sprinkle Enterprises, Inc., Debtor,**

**US Trustee, Trustee,**

**Universal Bonding Insurance Company, North River Insurance Company and Westchester Fire Insurance Company, Appellants.**

No. 91–5545.

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1992.

Decided April 2, 1992.

Robert W. McCann, Richard J. Allen, Jr. (argued), Klotz & McCann, Hawthorne, N.J., for appellants Universal Bonding Ins. Co., North River Ins. Co. and Westchester Fire Ins. Co.

Eric J. Clayman (argued), Jenkins & Jenkins, Haddon Heights, N.J., for appellee Gittens and Sprinkle Enterprises, Inc.

Before: COWEN, NYGAARD and GARTH, Circuit Judges.

### OPINION OF THE COURT

GARTH, Circuit Judge:

Gittens and Sprinkle Enterprises, Inc. ("Gittens"), a contractor, filed for bankruptcy protection and attempted, as debtor in possession, to collect outstanding contract balances due from state, municipal and federal agencies, for the purposes of reorganizing and using such funds as capital in new ventures. Gittens' surety, Universal Bonding Insurance Company ("Universal"), objected and argued that these balances constituted statutory or equitable trusts for the benefit of laborers and materialmen and therefore could not become part of Gittens' general estate. Both the bankruptcy court and the district court rejected Universal's arguments and held that the contract balances belonged to the bankrupt's estate free of any liens of laborers and materialmen.

We agree with the bankruptcy court and the district court that monies owed but not yet paid to Gittens by state, municipal and federal agencies do not constitute statutory

or equitable trusts in the hands of the government agencies and therefore may be collected by Gittens. We will therefore affirm the district court's order to the extent that it embodies this holding. However, we reach a different conclusion than did the bankruptcy court and district court regarding the status of monies owed to Gittens by state, municipal and federal agencies once they have been paid over to Gittens as debtor in possession.

Because we hold that the New Jersey Trust Fund Act directs that the monies paid by state and municipal agencies to Gittens be placed into a statutory trust fund for the benefit of laborers and materialmen, and because we hold that monies owed to Gittens by the federal agencies must, as a result of decisional law, be treated as a trust fund for the benefit of laborers and materialmen once paid to Gittens, we will vacate the district court's order and remand to the district court with instructions to the district court to, in turn, remand this case to the bankruptcy court for further proceedings consistent with this opinion.

## I.

Gittens filed a voluntary Chapter 11 bankruptcy petition on December 14, 1990. At the time of the bankruptcy filing, various state, municipal and federal agencies owed money to Gittens for completed contracts, as follows:

| | |
|---|---|
| Collingswood Board of Education Thomas Sharp Elementary School | $ 5,401.00 |
| Point Pleasant Board of Education | $15,440.52 |
| Fort Dix—Department of the Army | $28,059.86 |
| Department of Building and Construction c/o State of New Jersey State Police Headquarters | $ 5,414.80 |
| State of New Jersey—DBC Woodbine Developmental Ctr. | $ 7,552.20 |
| Rancocas Valley Regional High School | $13,584.99 |
| Audubon Board of Education | $16,545.30 |
| Veterans Administration | $50,000.00 (est.) |
| Waterford Township Board of Education | $ 8,202.61 |

As debtor in possession, Gittens filed a motion seeking a declaration that these contract balances were property of Gittens' bankrupt's estate pursuant to 11 U.S.C. § 541.

Universal, Gittens' payment and performance bond surety on those contracts, opposed Gittens' motion. Universal argued that New Jersey law imposed a statutory or equitable trust on the contract proceeds for the benefit of materialmen and laborers who had furnished labor, material and equipment on the projects. If released to the bankrupt's estate, Universal complained, funds that had served as primary security for Universal would not be distributed to materialmen and laborers but would rather be used as venture capital or distributed to Gittens' unsecured creditors, leaving Universal fully liable for the claims of unpaid materialmen and laborers.

On March 4, 1991, the bankruptcy court granted Gittens' motion, holding that the contract balances claimed by Gittens properly belonged, without limitation, to the bankrupt's estate. The Court rejected Universal's argument that those contract balances constituted a trust for the benefit of materialmen, laborers and the surety. The Court relied on *National Surety Corp. v. Barth*, 11 N.J. 506, 95 A.2d 145 (1953), in which the New Jersey Supreme Court held that the New Jersey Trust Fund Act, N.J.S.A. 2A:44–148, on which Universal relied, only imposed a trust on funds that a government agency *had already paid* to a contractor and not on funds that the government agency still had in its possession. Because the agencies had not yet paid Gittens at the time that Gittens filed its petition in bankruptcy, the Court held that no statutory trust had been created, and that "[t]o the extent that the money is due to [Gittens], it goes to [Gittens] without the imposition of a trust." (A. 32a).

Universal, along with co-sureties North River Insurance Company and Westchester Fire Insurance Company, (collectively, "Universal"), appealed the bankruptcy court's order to the United States district

court for the District of New Jersey. By memorandum and order of May 28, 1991, the district court affirmed the bankruptcy court's order. The district court agreed with the bankruptcy court that the New Jersey Trust Fund Act applied only to money that had already been paid by state and municipal agencies to contractors and therefore did not apply to funds that had not been paid to Gittens prior to Gittens' bankruptcy filing. The district court also held that "basic bankruptcy principles" would be violated if the Court were to impose an equitable trust on the contract proceeds or if the Court, under the common law principle of "exoneration," would order that those proceeds be used to pay contract obligations which, if unpaid, would become the obligation of Universal.

In addition to arguing that New Jersey law imposed a trust on contract balances held by New Jersey state and municipal agencies, Universal argued for the first time before the district court that, under federal law, contract balances held by federal agencies also constituted a trust for the benefit of laborers, materialmen and the surety. Universal cited *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), in which the United States Supreme Court held that sureties to federal contracts who compensate laborers and materialmen for completed work possess a common law "subrogation" right to step into the shoes of the compensated laborers and materialmen and thus are to be reimbursed out of contract balances that otherwise would have been paid to the contractor. The district court rejected this argument and held that *Pearlman* only applied where the surety had already paid the laborers and materialmen. The Court held that a surety who, like Universal, had not yet made such payments, possessed no subrogation right under *Pearlman.*

Universal appealed the district court's order affirming the bankruptcy court's order. Universal now argues before us that the district court failed to recognize that the contract balances in the hands of the municipal, state and federal agencies, as well as those funds that have already been paid to Gittens, constitute trusts to assure payment of laborers and materialmen.

## II.

### A.

■ In order to determine whether contract balances owed to Gittens by state and municipal agencies constitute trust funds, we must look to New Jersey state law. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"); *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1991) ("Although section 541 [of the Bankruptcy Code] defines property of the estate, we must look to state law to determine if a property right exists and to stake out its dimensions."). Universal claims that, under New Jersey law, the contract balances owed by New Jersey municipalities and by the state of New Jersey are either statutory trusts under the New Jersey Trust Fund Act or equitable trusts created pursuant to principles of equity, which include the common law principles of subrogation and exoneration.

The New Jersey Supreme Court's opinion in *National Surety Corp. v. Barth*, 11 N.J. 506, 95 A.2d 145 (1953), must serve as the starting point for any discussion of New Jersey law regarding statutory and equitable trusts imposed on contract balances owed by state and municipal agencies to contractors. Barth, a contractor, had defaulted on public housing contracts with the Public Housing and Development Authority ("Authority"), leaving completion of the contracts to the surety. The surety brought an action in the New Jersey Superior Court, Chancery Division, seeking the common law right of "exoneration;" i.e., the right to compel the Authority to pay contractual proceeds directly to unpaid materialmen and laborers rather than forwarding those proceeds to Barth. The surety also sought "subrogation;" i.e., compensation to be paid directly by the Authority to the surety for monies that the surety itself had already paid to material-

men and laborers to discharge their claims. The surety argued that the New Jersey Trust Fund Act, N.J.S.A. 2A:44–148, imposed a trust on the contractual proceeds for the benefit of laborers and materialmen.

The State of New Jersey ("State") objected to the surety's claims and instead urged that the funds still held by the Authority, be paid to the State to offset the State's claim against Barth for unpaid unemployment and disability tax obligations. However, the Chancery Division, in *National Surety Corp. v. Barth*, 20 N.J.Super. 100, 89 A.2d 104 (Ch.Div.1952), sided with the surety and refused to permit any offset by the State. The Chancery Division held that the funds in question were "a trust fund for the benefit of those whose work, material and equipment have made it payable." *Id.*, 89 A.2d at 108.

On appeal, the New Jersey Supreme Court affirmed the Chancery Division's opinion. The Court first considered the applicability of the New Jersey Trust Fund Act. The Trust Fund Act provides that

[a]ll money paid by the State of New Jersey or by any agency commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement ... shall constitute a trust fund in the hands of such person ... until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid.

N.J.S.A. 2A:44–148. The Court, noting that Trust Fund Act referred only to monies that had actually been "paid" to a contractor and not to contract balances still in the possession of a state agency, held that the Trust Fund Act did not apply to funds held by the Authority. "Clearly the statute does not impress a trust upon the funds still in the possession of the State and not yet paid to the contractor." 95 A.2d at 147.

Having determined that no statutory trust existed, the New Jersey Supreme Court in *Barth* then considered whether the monies held by the Authority constituted an equitable trust. The Court explained that in order to ascertain whether an equitable trust existed, the Court would need to examine the "source and purpose" of the funds held by the authority. The Court determined that the funds had been gathered pursuant to a legislative Act entitled "An Act Providing for Housing for Veterans of World War II and Other People of the State and Declaring an Emergency in Respect Thereto." This Act provided that funds collected through the sale of bonds and from federal and state appropriations would be held in a "separate fund" known as the "State Housing Fund," and explained that "[t]he moneys in the said State Housing Fund are hereby specifically Dedicated to providing housing for veterans of World War II and other people of the State."

The Court noted that under the circumstances, where "[t]he legislature clearly intended to set aside all moneys received from [specific] sources and to earmark them for the purposes of public housing," the funds constituted an equitable trust. *Id.*, 95 A.2d at 149. Having determined that a trust existed, the Court held that "[t]he materialmen and laborers, and therefore [the surety] in view of its subrogation rights, have an equitable interest in these funds" that could not be defeated by the State's exercise of a setoff. *Id.*

New Jersey courts have consistently read *Barth* to impose an equitable trust only over funds that, because of their origins and because of the way in which they had been dedicated or earmarked, could only be disbursed for the designated purpose for which they were obtained. In *Board of Ed. of City of Pleasantville v. Aiken*, 69 N.J.Super. 70, 173 A.2d 527 (Ch. Div.1961), the Chancery Division held that contract balances in the possession of a Board of Education and owed to a contractor for cleaning drapes did not constitute a trust fund because "there are no proofs indicating that those funds, when received by the Board, were in fact designated to be used for a specific purpose, and that purpose only." *Id.*, 173 A.2d at 534. On the

other hand, in *Picker v. City of Bayonne,* 60 N.J.Super. 251, 158 A.2d 692 (Ch.Div. 1960), the Chancery Division held that contract balances in the possession of the City of Bayonne and owed to a contractor for constructing swimming pools constituted a trust fund for the benefit of laborers and materialmen because the funds had been held in a separate appropriation account and because a major portion of the funds allocated for the project were raised by municipal bond anticipation notes. The Court noted that New Jersey law required that "[t]he proceeds of the sale of any obligations issued under this article shall be applied only to the purposes for which such obligations are authorized."

In the present case, we are satisfied that the bankruptcy court and the district court correctly held that *Barth* precluded the imposition of a statutory trust on monies currently held by state and municipal agencies. The monies had not as yet been paid to Gittens and therefore did not yet fall within the ambit of the Trust Fund Act. Additionally, nothing in the present record indicates that the funds in issue were collected, dedicated or earmarked by the state and municipal agencies in such a way as to have created an equitable trust under New Jersey law. We therefore agree with both the bankruptcy court and the district court that those funds remaining in the hands of the agencies were not trust funds within the terms of the Trust Fund Act and were not subject to an equitable trust.[1]

### B.

■ Both the bankruptcy court and the district court focused their attention on the status of monies owed to Gittens by the state and municipal agencies. Having concluded that those monies were not held by the agencies in trust, both courts held that the monies should be paid to Gittens' estate for distribution to general creditors or for Gittens' use in its effort to reorganize. The bankruptcy court's opinion stated that "[t]o the extent that the money is due to

[Gittens], it goes to [Gittens] without the imposition of a trust." (A. 32a). The district court announced that "Gittens and the bankruptcy trustee should make every effort to pay the materialmen and laborers, but equity does not demand their preference over other general creditors or their payment when to do so could well defeat the Chapter 11 reorganization." (A. 11a).

While we agree that the monies must be paid over to Gittens as debtor in possession, we do not agree with the bankruptcy court and the district court that monies that Gittens has received or will receive from state and municipal agencies after the filing of its petition may be allocated to, and be distributed to, general creditors or used by Gittens in its effort to reorganize. Rather, we hold that Gittens, once it has received the monies from the various agencies, must hold those monies subject to the statutory trust imposed by the New Jersey Trust Fund Act.

■ The filing of a bankruptcy petition creates an estate in bankruptcy. This estate, pursuant to section 541(a)(1) of the Code, contains "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(a)(1) is thus broad enough to capture into the estate funds that are to be held as trust funds by the debtor in possession. However, section 541(d) clarifies that property in which the debtor holds only legal title, and does not hold an equitable interest, such as trust funds, is included in the bankrupt's estate only to the extent of the debtor's legal title to the property and not to the extent of any interest in the property that the debtor does not hold:

> It is a basic tenet of trust law that the trustee has a legal interest in the property he holds, which requires its inclusion under § 541(a). However, the Bankruptcy Code does not overlook the outstanding beneficial interests. According to § 541(d) the property comes into the estate subject to those interests.

---

1. Judge Nygaard would hold that the funds held by the state and local agencies were subject to an equitable trust in favor of the unpaid materi-almen under New Jersey common law and the principles as recognized in *National Surety Corp. v. Barth.*

*In re Glover Const. Co.*, 30 B.R. 873, 883 (Bankr.W.D.Ky.1983).

■ Gittens' bankrupt estate thus obtains no greater ownership right over the payments than Gittens itself would have acquired prior to the bankruptcy filing.[2] Gittens' bankrupt estate may retain legal title over the trust, but the beneficiaries of the trust, (namely, the laborers, materialmen and the surety after satisfying the claims of laborers and materialmen), may reclaim their equitable interests in the trust fund so created through bankruptcy court proceedings. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36, 83 S.Ct. 232, 234, 9 L.Ed.2d 190 (1962) ("[Bankruptcy law] simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors."); *Matter of Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir.1985) ("Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own."). The legislative history to section 541 of the Code supports this conclusion. *See* S.Rep. 95–989 at 82, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868 (explaining that section 541 of the Code "will not affect various statutory provisions ... that create a trust fund for the benefit of a creditor of the debtor").

Our conclusion regarding the operation of the Trust Fund Act in the context of bankruptcy respects the traditional role of the states as creators and definers of the property interests to which the bankruptcy law applies. *See, e.g., Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979). In the present context, a federal court may not circumvent the New Jersey legislature's determination that public contract laborers and materialmen on public contracts require special protection. *See Key Agency v. Continental Casualty Co.*, 55 N.J.Super. 58, 149 A.2d 797, 800 (Ch.Div.1959) (discussing the reasons behind the Trust Fund Act's enactment).

We therefore agree with the opinion of the Court of Appeals for the Sixth Circuit in *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir.1979), which held that an analogous statute to the New Jersey Trust Fund Act required that funds paid to materialmen and laborers within four months of bankruptcy were not deemed to be preferences and were treated as trust funds. *Selby* involved a contractor who filed for bankruptcy less than four months after having paid subcontractors. The contractor's trustee in bankruptcy moved to set aside the payments to the subcontractors as preferential transfers and to bring the funds into the bankrupt's estate for distribution to general creditors. The subcontractors responded that they had received the money as beneficiaries of the Michigan Builders Trust Fund Act, which provided that:

> [i]n the building construction industry, the building contract fund paid by any person to a contractor ... shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen.... [T]he contractor ... shall be considered the Trustee of all funds so paid to him for building construction purposes.

Mich.Comp.Laws Ann. § 570.151 (1967). The district court ruled in favor of the subcontractors, *see* 405 F.Supp. 164 (E.D.Mich.1975), and the trustee in bankruptcy appealed. The Court of Appeals for the Sixth Circuit affirmed, holding that the Builders Trust Fund Act had imposed a trust on the funds in the hands of the contractor such that the beneficial interest of the trust could not be considered the "property" of the bankrupt contractor or his estate in bankruptcy. *See id.* at 647.

Our holding in the present case is not affected by the fact that Gittens received or will receive payments *after*, rather than *before*, its bankruptcy filing. We have no doubt that if, one day before Gittens filed for bankruptcy protection, the state and

---

**2.** Section 541(d)'s limitation on the scope of the bankruptcy estate prevails over the trustee's strong-arm powers under section 544 of the Code. *See Matter of Quality Holstein Leasing*, 752 F.2d 1009, 1013 (5th Cir.1985).

municipal agencies had paid the contract balances which they owed to Gittens, those funds would have remained in Gittens' hands as trust funds available only to those for whose benefit the New Jersey Trust Fund Act was enacted. *See, e.g., Pearlman,* 371 U.S. at 136, 83 S.Ct. at 234 (trust funds received by debtor retain their trust status despite the debtor's subsequent bankruptcy).

We are therefore satisfied that Gittens cannot be said to have ever possessed the right to use the contract balances at issue here for its own benefit. Up until the moment of the bankruptcy filing, Gittens merely had a right to receive and hold these monies as a trustee for the materialmen and laborers. Gittens' right to those monies did not change the moment that Gittens filed its bankruptcy petition: "the rule is elementary that the estate succeeds only to the title and rights in the property that the debtor possessed...." *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962, 968 (5th Cir.1983) (quoting 4 Colliers on Bankruptcy § 541.13 at 541–66 (15th ed. 1983). *Cf. In re Inca Materials, Inc.,* 880 F.2d 1307 (11th Cir.1989) (imposing a constructive trust for the benefit of materialmen on postpetition payment to bankrupt subcontractor).[3]

*In re Matthews Associates, Inc.,* 394 F.2d 101 (3d Cir.1968), was not to the contrary. That case involved a criminal statute, N.J.S.A. 2A:102–11, that made it a misdemeanor for a subcontractor to spend monies received from a contractor before compensating laborers and materialmen. Although the criminal statute referred to the payment received by the subcontractor from the contractor as a "trust fund," we held in *Matthews* that postpetition payments to a bankrupt subcontractor for a private contract entered the estate without the imposition of a trust.

*Matthews,* which was relied upon by the district court and by the appellees, is clearly distinguishable from the present Gittens situation, and does not authorize in the present case a conversion of what would otherwise be trust funds into general estate funds. First, the *Matthews* statute, despite its use of the term "trust fund," did not provide a civil cause of action for unpaid laborers and materialmen who wished to receive payment from the "trust." *See Samuel D. Wasserman, Inc. v. Klahre,* 24 N.J.Super. 143, 93 A.2d 628, 631 (App.Div. 1952), *quoted in Matthews,* 394 F.2d at 103 n. 2 ("[i]t is entirely clear to us that the scope of the statutory provision ... is limited to the creation of a criminal offense; and that no civil action can be based directly on the statute."). Second, *Matthews* concerned a private contract and did not address the issue of public contracts such as the contracts in the present case. Because of its private-contract context, *Matthews* did not even mention the New Jersey Trust Fund Act, N.J.S.A. 2A:44–148, which is a civil statute that only applies in the context of public contracts.

■ We therefore hold that monies received by Gittens from state and municipal agencies constitute trust funds for the benefit of laborers and materialmen. More-

---

**3.** In an analogous circumstance, we have already recognized that monies received by a trustee in bankruptcy may become trust funds upon their receipt by the trustee in bankruptcy and therefore may not be considered assets of the estate. *United States Nat. Bank v. Blauner's Affiliated Stores,* 75 F.2d 826 (3d Cir.1935) (per curiam), involved the owner of a department store, George Kline, who leased store space to several parties who used the leased space to sell their goods. Pursuant to a contract between Kline and the lessees, Kline collected monies owed by purchasers of goods and held those monies in trust for the lessees. After Kline filed for bankruptcy protection, the trustee in bankruptcy continued to collect monies owed to the lessees.

Faced with the question of whether these monies collected by the trustee in bankruptcy properly belonged to the general creditors or to the lessees, the Bankruptcy Court and the District Court held in favor of the lessees. *See In re Kline,* 7 F.Supp. 850 (W.D.Pa.1934). We affirmed on appeal and quoted the District Court's holding that "the relation of debtor and creditor did not exist between the bankrupt and the several claimants as to the moneys collected by the [trustee in bankruptcy] on these credit-accounts; ... this money was trust-fund money and was properly allotted by the referee to [the lessees]." *Blauner's,* 75 F.2d at 826, *quoting In re Kline,* 7 F.Supp. at 851.

over, when and if Universal pays Gittens' indebtedness to laborers or materialmen, it may pursue the statutory remedies of the laborers or materialmen by proceeding against such funds. *See Montefusco Excavating v. County of Middlesex,* 82 N.J. 519, 414 A.2d 961, 964 (1980).

### C.

Universal argues that the monies owed to Gittens by federal agencies constitute an equitable trust for materialmen and laborers under *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). In *Pearlman,* a default by a bankrupt contractor resulted in the surety paying labor and material claims. The contract balance of $87,000 was turned over to the trustee who held it on the assumption that it was property of the bankrupt. The surety, which had paid out $350,000 to laborers and materialmen, sought an order determining that it had the right to receive those funds from the trustee. The bankruptcy court denied the surety's petition and ordered that the surety's claim only be allowed as a claim of a general creditor. The district court vacated the bankruptcy court's order, *see In re Dutcher Constr. Corp.,* 197 F.Supp. 441 (W.D.N.Y.1961), and its decision was affirmed by the Court of Appeals for the Second Circuit. *See In re Dutcher Constr. Corp.,* 298 F.2d 655 (2d Cir.1962). A conflict among the circuits on this issue resulted in the Supreme Court granting certiorari. *See* 371 U.S. at 135, 83 S.Ct. at 234.

The Supreme Court affirmed and held that the surety, having been subrogated to the rights of "the laborers and materialmen [who] ha[ve] a right to be paid out of the fund," could collect the funds in question. *Pearlman,* 371 U.S. at 141, 83 S.Ct. at 237. In the present case, where the laborers and materialmen have not yet been compensated, Universal argues that a trust nevertheless exists in the hands of the government for the benefit of the laborers and materialman. Universal reasons that the surety in *Pearlman* could not have received greater rights through subrogation than the laborers and materialmen

themselves had possessed before having been compensated by the surety.

Universal's argument might have persuaded us were it not for the Supreme Court's decision in *United States v. Munsey Trust Co.,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). In *Munsey,* a federal government corporation ("Government") held contract balances due to a contractor who had completed certain contracts for the Government but had failed to compensate laborers and materialmen. After the contractor's surety paid the laborers and materialmen, the district court, at the request of one of the surety's stockholders, appointed a receiver to collect the account balances from the government and to pay the monies thus collected to the surety.

The Government turned over to the surety a portion of the monies that had been retained in connection with each contract, but withheld monies that the contractor had owed to the Government in connection with an unrelated contract. The receiver objected and argued that the surety, having been subrogated to the rights of the laborers and materialmen whom it had paid, had a claim to the retained funds that was superior to the setoff claim of the Government. On appeal, the Court of Claims held in favor of the surety and reversed. The Supreme Court granted certiorari.

The Supreme Court reversed the judgment of the Court of Claims and held that the Government had properly set off its independent claim against the amount owed to the surety. The Court explained that the Government could permissibly exercise the same setoff right against the surety that the Government could have exercised against the contractor. The Court rejected the notion that the surety may have acquired, through subrogation to the rights of the laborers and materialmen, a right to the retained funds superior to the setoff right of the government. In the Supreme Court's view, laborers and materialmen possessed no assertible rights against the Government to which the surety could be subrogated:

[N]othing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation.... [I]t is elementary that one cannot acquire by subrogation what another whose rights he claims did not have....

*Id.* at 241–42, 67 S.Ct. at 1602–03.

Thus, as *Pearlman*'s three concurring Justices recognized, *see* 371 U.S. at 142–44, 83 S.Ct. at 237–38, *Munsey* and *Pearlman* appear to offer conflicting responses to the question posed to us in the present case; i.e., do unpaid laborers and materialmen possess rights to contract balances owed, but not yet paid, by federal agencies to contractors? Under *Pearlman*, they apparently do possess such rights, as evidenced by *Pearlman*'s holding that the surety, which had paid laborers and materialmen, received such rights from them through subrogation. Under *Munsey*, however, laborers and materialmen may not assert any such rights.

Despite the apparent conflict between *Pearlman* and *Munsey*, we are satisfied that the United States Court of Claims, sitting en banc, correctly reconciled the two cases in *United States Fidelity & Guar. Co. v. United States*, 475 F.2d 1377, 201 Ct.Cl. 1 (1973) (en banc) ("*U.S.F. & G.*").[4] In *U.S.F. & G.*, a surety to a defaulting government contractor paid a portion of the claims of laborers and materialmen and then sued the government for contract balances owed by the government to the contractor. The surety joined as co-plaintiffs all laborers and materialmen who had not been fully paid.

The Court of Claims held that the surety could not collect contract balances from the government before the surety had paid all outstanding claims to the laborers and materialmen. Having written the surety out of the picture, the Court went on to discuss "[t]he more difficult issue concern[ing] the rights of the laborers and materialmen. Clearly, they are entitled to this fund on the equities, but the troublesome issue is

whether they actually have standing to sue for the amount in this court." *Id.*, 475 F.2d at 1381.

The Court looked to *Pearlman* and *Munsey* for guidance and confronted the apparent conflict that we have discussed above:

There is, however, a problem in reconciling *Munsey* and *Pearlman* with respect to their discussions of the measure of the rights of the laborers and materialmen, even though the cases stand side-by side. It is a short step from *Pearlman* to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly, which is in complete conflict with the language in *Munsey*, as recognized by Justice Clark's concurring opinion in *Pearlman*.

*Id.*, 475 F.2d at 1382.

The Court of Claims resolved the apparent conflict by noting that the *Munsey* Court had stated only that, in light of the federal government's sovereign immunity, laborers and contractors possessed no *enforceable* rights against the funds retained by the government, not that they possessed no rights in those funds at all. The Court of Claims held that

[t]he subcontractors do possess equitable rights to the retained funds vis-a-vis other claimants to the money, but their rights cited by the courts in deciding, for example, that a surety who pays the subcontractors on a contract has priority via subrogation to the retained funds over an assignee of the prime contractor, do not necessarily include or imply a right in the subcontractor itself to sue the Government.

*Id.* The Court of Claims therefore declined to grant the laborers and materialmen standing to sue for the amount retained by the Government.

■ We agree with the Court of Claims that unpaid laborers and materialmen possess, but may not enforce through suit against the government, an equitable interest in contract balances retained by the

---

**4.** The Court of Claims' successor, the Court of Appeals for the Federal Circuit, reiterated and defended the *U.S.F. & G.* holding in *United Elec.*

*Corp. v. United States*, 647 F.2d 1082, 227 Ct.Cl. 236 (Fed.Cir.1981).

government. It was this equitable interest to which the surety was subrogated in *Pearlman.*

If the laborers and materialmen have no standing to sue the government for retained funds, how did the surety in *Pearlman,* which was subrogated to the rights of the laborers and materialmen, acquire such standing? The Court of Claims answered this question by noting that, under *Pearlman,* a surety which has paid materialmen and laborers is not only subrogated to their rights, but is also subrogated to the rights of the contractor whose debt the surety paid. *See Pearlman,* 371 U.S. at 132, 83 S.Ct. at 232. The contractor, had he completed the project and compensated laborers and materialmen, would have had standing to sue the government for retained funds because the contractor, unlike laborers and materialmen, was in privity of contract with the government. *See* 28 U.S.C. § 1491 (waiving sovereign immunity with respect to suits for breach of contract). The *Pearlman* surety thus acquired the contractor's standing through subrogation. 475 F.2d at 1376.

■ The Court of Claims in *U.S.F. & G.* noted that "[h]ad this contractor been declared bankrupt, his trustee would have a valid claim to the unexpended funds to which the subcontractors would then have a claim." 475 F.2d at 1388. We agree. In the present case, the record does not disclose that the surety has paid laborers and materialmen. The surety therefore could not have acquired subrogation rights. Nor could the laborers and materialmen themselves, in light of *Munsey,* possess standing to collect contract balances from the federal agencies. Only the contractor Gittens, debtor in possession, has an enforceable claim against those funds under section 541 of the Bankruptcy Code. However, the laborers and materialmen retain their equitable interest in the funds paid to Gittens by the federal agencies. Although the laborers and materialmen may not enforce their equitable interest in the funds while those funds are still retained by the government, they may enforce their interest in the funds once the funds are received by Gittens, with whom the laborers and materialmen were in privity of contract.

■ Having recognized that the laborers and materialmen retain an interest in funds received by Gittens from the federal agencies, we have no difficulty holding that their interest in such funds is that of trust fund beneficiaries. It would be anomalous to hold that sureties which, under *Pearlman,* become trust fund beneficiaries through subrogation to the rights of laborers and materialmen obtain a greater interest in the retained funds than the laborers and materialmen could themselves obtain once the funds are released to the contractor. *See Munsey,* 332 U.S. at 241–42, 67 S.Ct. at 1603 ("[I]t is elementary that one cannot acquire by subrogation what another whose rights he claims did not have").

■ We therefore hold that the funds owed by the federal agencies to Gittens should be paid to Gittens as debtor in possession pursuant to the broad language of section 541 of the Code. We also hold that once the funds are received by Gittens, they will constitute an equitable trust for the benefit of laborers and materialmen. Universal may become a beneficiary of this trust by fulfilling its obligation to compensate the laborers and materialmen.

### D.

We recognize that the funds that Gittens has already received from various state, municipal and federal agencies may have already been paid to general creditors, used in the daily operation of the business, or commingled with the bankruptcy estate. The record before us is silent as to the disposition and status of such funds. Not having access to information regarding the status of these monies, and not knowing whether Universal has as yet acquired subrogation rights by paying laborers and materialmen, we will leave to the bankruptcy court the task of determining how, if at all, Universal may recover those funds consistent with the foregoing opinion. If need be, the bankruptcy court should develop an additional record and take additional evidence to make these determinations.

### III.

We will affirm the district court's order with respect to the district court's determinations that monies owed to Gittens by federal, state and municipal agencies do not constitute trust funds while those monies remain in the hands of those agencies. However, we will vacate so much of the district court's order which held that monies paid to Gittens by state, municipal and federal agencies may be used by Gittens' general estate in its reorganization efforts. We will therefore remand this case to the district court with instructions to the district court to, in turn, remand this case to the bankruptcy court for further proceedings consistent with this opinion.

Each party shall bear its own costs.